provide needed laboratory studies at the lowest bid price from vendors which is consistent with quality and timeliness of performance; (2) that SRS International will not let any non-clinical study without Histogenics Corporation being first provided for its own review the bids obtained by SRS International Corporation and Histogenics Corporation's approval of SRS International's selection of appropriate non-clinical study sites; (3) that as may be required by FDA requests or by changes in the study design assumptions set forth herein that the associated costs for non-clinical laboratory studies and certain portions of SRS International's fees associated with the management, monitoring, evaluation, and reporting of same may change; provided however, that no change order to the costs above estimated shall be made without Histogenics Corporations' prior review and approval, which approval shall not unreasonably be withheld unless Histogenics Corporation decides as a result to revoke this Task Order pursuant to the revocation provision of the Master Consulting Agreement.

The above estimates do not include travel costs. SRS International Corporation will advise Histogenics Corporation that a certain number of trips will be needed and negotiate a budget for travel on this basis. As an example of SRS's approach to travel costs, a pilot clinical study with one center located somewhere between New England and Florida, one would estimate a maximum of 6 visits as day-trips. At a reasonable $500 per airfare, this is $3,000 in air travel for the pilot study.

## TIME FRAME FOR COMPLETION:

SRS International will complete the Scope of Work on the following schedule:

As per the time frame estimates provided on Attachment No. 1 to this Task Order, which is incorporated herein by reference. The "clock" for these time frames will commence as of the execution of this Task Order by Histogenics Corporation and receipt by SRS International Corporation of the start-up payment called for hereunder.

Both Histogenics Corporation and SRS International Corporation agree that SRS International will use its best efforts to adhere to the stated time frame estimates; provided that, Histogenics Corporation responds timely to SRS information queries and requests for decisions and that factors outside of SRS International Corporation's reasonable control do not occur. As may be required due to Histogenics Corporations' own needs, tardiness in response to SRS International requests, and/or factors outside of SRS International's reasonable control these time frames may be reasonably adjusted by mutual consent; provided however, that no change order to the time frames above estimated shall be made without Histogenics Corporations' prior review and approval, which approval shall not unreasonably be withheld unless Histogenics Corporation decides as a result to revoke this Task Order pursuant to the revocation provision of the Master Consulting Agreement.

TASK ORDER No. HISTOGENICS-00-001

**Page 4 of 9**

## CONDITIONS OF COMPENSATION:

Histogenics Corporation agrees to the following payment schedule in connection with this Task Order:

### Base Program 1 (through Phase I Clinical Study)

| Due Date | % of Cost | Payment Total |
|---|---|---|
| SRS Fees – | | |
| On Contract Execution[1] | 22.19% | $ 39,340.00 |
| On Placing Standard Biocompatibility Tests and 28-Day Implant Biocompatibility Study in Rabbits[2] | 2.41% | $ 4,275.00 |
| On Communicating with FDA to set up pre-IDE Meeting[3] | 7.05% | $ 12,504.00 |
| On pre-IDE meeting[4] | 14.10% | $ 25,000.00 |
| On Reporting Standard Biocompatibility Tests and 28-Day Implant Biocompatibility Study in Rabbits[2] | 2.41% | $ 4,275.00 |
| On IDE Submission[4] | 14.10% | $ 25,000.00 |
| On IDE Approval[5] | 9.32% | $ 16,520.00 |
| On Clinical Trial Initiation[6] | 8.52% | $ 15,107.85 |

[1] Covers: detailed review of TES system, general consultation costs, request for assignment of review component at FDA, follow-up on request for assignment, and consultations on pig study design.
[2] Cover 50% of associated estimated SRS fees
[3] Covers fees for pre-IDE meeting preparation and pre-IDE meeting
[4] Covers 50% of IDE preparation fees
[5] Covers IDE follow-up, pre-study IRB and investigator interaction, and other pre-study activity

TASK ORDER No. HISTOGENICS-00-001

| | | |
|---|---|---|
| On 50% enrollment in Phase I clinical trial[7] | 5.68% | $ 10,071.90 |
| On 100% enrollment in Phase I clinical trial[7] | 5.68% | $ 10,071.90 |
| On Draft Phase I Report[8] | 4.26% | $ 7,553.92 |
| On Final Phase I Report[8] | 4.26% | $ 7,553.93 |
| Totals ........... | 100.00% | $177,273.50 |

Non-clinical laboratory fees –

Per study placed, normally as 50% at placement, and 50% on report, therefore estimated at –

| | |
|---|---|
| On Placing Standard Biocompatibility Tests and 28-Day Implant Biocompatibility Study in Rabbits | $ 28,500.00 |
| On Reporting Standard Biocompatibility Tests and 28-Day Implant Biocompatibility Study in Rabbits | $ 28,500.00 |

Clinical Site fees –

Typically 40% on placement, 20% on 50% enrollment, 20% on 100% enrollment and 20% on study completion / site closure with all data queries resolved. Therefore, estimated at –

| | |
|---|---|
| On study placement | $ 51,800 |
| On 50% enrollment | $ 25,900 |
| On 100% enrollment | $ 25,900 |
| On close out and query resolution | $ 25,900 |

Payments are to be due and payable as specified in the Master Consulting Agreement for progress and/or milestone payments.

[6] Covers 30% of SRS fees for clinical trial
[7] Covers 20% of SRS fees for clinical trial
[8] Covers 15% of SRS fees for clinical trial

TASK ORDER No. HISTOGENICS-00-001

## Base Program 2 (Phase II/III Clinical Study through PMA Approval)

| Due Date | % of Cost | Payment Total |
|---|---|---|
| SRS Fees – | | |
| On Filing IDE Supplement to Start Phase II/III Studies[9] | 5.01% | $ 29,760.00 |
| On Clinical Trial Initiation[10] | 17.57% | $104,444.43 |
| On 50% enrollment in Phase II/III clinical trial[11] | 11.71% | $ 69,629.62 |
| On IDE Annual Report No. 1 | 0.84% | $  5,000.00 |
| On 100% enrollment in Phase II/III clinical trial[11] | 11.71% | $ 69,629.62 |
| On IDE Annual Report No. 2 (if needed) | 0.84% | $  5,000.00 |
| On Draft Phase II/III Report[12] | 8.78% | $ 52,222.22 |
| On initiation of pre-PMA meeting activity | 1.92% | $ 11,424.00 |
| On completion of pre-PMA meeting[13] | 12.61% | $ 75,000.00 |
| On Final Phase II/III Report[12] | 8.78% | $ 52,222.22 |
| On submission of PMA[14] | 6.91% | $ 41,070.00 |
| On setting of date for Advisory Panel meeting | 6.40% | $ 38,080.00 |

[9] Covers: general consultation costs & supplement preparation
[10] Covers 30% of SRS fees for clinical trial
[11] Covers 20% of SRS fees for clinical trial
[12] Covers 15% of SRS fees for clinical trial
[13] Covers 50% of PMA preparation fees
[14] Covers 25% of PMA preparation fees plus 50% of PMA follow-up fees

TASK ORDER No. HISTOGENICS-00-001

On approval of PMA[15]                  6.91%              $ 41,070.00

   Totals ...........      100.00%            $594,552.13

Clinical Site fees -

Typically 40% on placement, 20% on 50% enrollment, 20% on 100%
enrollment and 20% on study completion / site closure with all data queries
resolved. Therefore, estimated at –

| | |
|---|---|
| On study placement | $600,000.00 |
| On 50% enrollment | $300,000.00 |
| On 100% enrollment | $300,000.00 |
| On close out and query resolution | $300,000.00 |

    Payments are to be due and payable as specified in the Master Consulting Agreement for
progress and/or milestone payments.

## Contingent Program  (if implemented)

| Due Date | % of Cost | Payment Total |
|---|---|---|
| SRS Fees – | | |
| On Placing Studies | 50% | $ 15,750.00 |
| On Reporting Studies | 50% | $ 15,750.00 |
| Totals ........... | 100% | $ 31,500.00 |

Non-clinical laboratory fees –

Per study placed, normally as 50% at placement, and 50% on report,
therefore estimated at –

| | |
|---|---|
| On Placing Studies | $105,000.00 |
| On Reporting Studies | $105,000.00 |

---

[15] Covers 25% of PMA preparation fees plus 50% of PMA follow-up fees

**TASK ORDER No. HISTOGENICS-00-001**

Payments are to be due and payable as specified in the Master Consulting Agreement for progress and/or milestone payments.

**APPROVALS:**


John A. Todhunter, Ph.D.
DABT, DABFE, FAIC, RAC
President,
SRS International Corporation

4 - 5 - 01
Date


Laurence J.B. Tarrant, Ph.D.
President,
Histogenics Corporation

7-11-01
Date


**TASK ORDER No. HISTOGENICS-00-001**

**Page 9 of 9**

C

## DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.

ATTORNEYS AT LAW
ONE MONARCH PLACE, SUITE 1900
SPRINGFIELD, MASSACHUSETTS 01144-1900

TELEPHONE (413) 733-3111

TELECOPIER (413) 734-3910

WWW.DWPM.COM
E MAIL: BROWN@DWPM.COM

PAUL S. DOHERTY
PHILIP J. CALLAN, JR
GARY P. SHANNON
ROBERT L. LEONARD
A. CRAIG BROWN
L. JEFFREY MEEHAN
JOHN J. MCCARTHY
DAVID J. MARTEL‡
WILLIAM P. HADLEY
BARRY M. RYAN
DEBORAH A. BASILE†
PAUL M. MALECK
CLAIRE L. THOMPSON
W. GARTH JANES**
GREGORY A. SCHMIDT
MICHAEL K. CALLAN*
MICHAEL D. SWEET*‡
BERNADETTE HARRIGAN‡
BRENDA S. DOHERTY
MICHELE A. ROOKE
THOMAS E. DAY

ROBERT E. MURPHY
SAMUEL A. MARSELLA
MATTHEW J. RYAN, JR.
OF COUNSEL

DUDLEY B. WALLACE
(1900-1987)
LOUIS W. DOHERTY
(1898-1990)
FREDERICK S. PILLSBURY
(1919-1996)

† REGISTERED PATENT ATTORNEY
* ALSO ADMITTED IN CONNECTICUT
‡ ALSO ADMITTED IN NEW YORK
** ALSO ADMITTED IN DISTRICT OF COLUMBIA

August 27, 2003

**VIA EMAIL, TELECOPIER and**
**FEDERAL EXPRESS**
John A. Todhunter, Ph.D., President
SRS International Corporation
Health Care Group
1901 L Street NW, Suite 250
Washington, DC 20036-3503

Re:    Notice of Immediate Termination of Master Agreement for Services

Dear Dr. Todhunter:

    We represent Histogenics Corporation ("Histogenics"). This letter constitutes notice of the immediate termination of the Master Agreement for Services between Histogenics and SRS International Corporation ("SRS") dated April 5/April 11, 2001, as it may have been amended (the "Agreement"), as a direct result of the material breach by SRS of the Agreement. This notice of immediate termination for material breach of the Agreement by SRS is based upon the following:

    1.    The initial Task Order made part of the Agreement provided for SRS to receive payments from Histogenics solely upon achieving certain milestones, as described on Pages 5, 6, 7 and 8 of the initial Task Order. The initial Task Order did not provide in any manner whatsoever for payment by Histogenics to SRS of any "consulting fees" without regard to achieving a particular milestone in the overall program, with the exception of the initial payment made on contract execution, which included, "general consultation costs" and "consultations on pig study design". All other payments required to be made by Histogenics to SRS pursuant to the initial Task Order were to be made by Histogenics only upon SRS achieving the milestones described in Pages 5 through 8 of the initial Task Order.

192692-1

2.    The overall budget was revised substantially in accordance with a schedule dated September 28, 2001 that was prepared by SRS. This revised budget included a new line item entitled "meetings/consultations with Histogenics" in the total amount of $202,752.00. Although no payment schedule was included in the September 28, 2001 revised schedule of payments with respect to this $202,752.00 amount, on October 10, 2001 you wrote to Histogenics and stated that SRS mistakenly failed to include regular progress payments on account of this consultation payment amount. You proposed to correct this "error" by separating the entire $202,750.00 amount into 50 equal monthly installments "which correspond roughly with the period of time over which these consultations are provided on an ongoing basis", resulting in monthly payments of $4,055.04 each month beginning November, 2001.

3.    You wrote to Histogenics on February 11, 2002 requesting that the monthly general consulting payments be rescheduled and "front loaded", increasing the monthly consulting payment from $4,055.04 to $7,300.00 beginning March 1, 2002, including a "catch-up" payment of $12,988.00 that was intended to accelerate the consulting payment schedule effective as of the November, 2001 payment.

4.    In your November 5, 2002 Executive Summary that you sent to Histogenics, you summarize on Page 4 the previous total of payments to be made by Histogenics to SRS. This Summary includes consultation payments through the date of the Executive Summary of $68,500.44, and remaining consultation payments of $205,632.00, totaling $274,176.00. This total substantially exceeds the consulting payment line item of $202,750.00 that was included in the September 28, 2001 revised schedule, and there is no apparent basis for any increase in the consulting payments.

5.    Equally disturbing, however, the November 5, 2002 Executive Summary provides for an increase in consultation payments to $685,440.00, and an increase in the monthly consulting base payment from $7,300.00 to $14,964.00.

6.    In your December 5, 2002 letter to Histogenics you provided for the monthly consulting payment amounts to increase from $7,300.00 to the "reduced" amount of $12,000.00, with "makeup" payments for November and December, 2002 in the amount of $4,700.00 payable in January, 2003 and the new monthly payment in the amount of $12,000.00 payable beginning in January, 2003.

7.    The net effect of all of these changes was to transform the payment provisions of the relationship between Histogenics and SRS from a series of payments based on achieving certain program milestones (with the sole exception of the initial payment on contract execution) to what became essentially a series of substantial monthly general consulting payments required to be made by Histogenics without regard to the amount of services being provided by SRS.

8.    It is clear that SRS has completely transformed the original Agreement from a milestone and performance based series of payments to a series of monthly consulting payments billed by SRS without regard to performance. It is the position of Histogenics that SRS has

manipulated the arrangement with Histogenics in a manner that is detrimental to Histogenics and solely for the financial benefit of SRS. It is also the position of Histogenics that since the filing of the IND with the FDA on July 29, 2002 SRS has failed completely to perform in any meaningful manner the services required to be performed by SRS pursuant to the Agreement, including without limitation services relating to the initiation of the clinical trials. As a result Histogenics has substantially and dramatically overpaid SRS for the work performed to date, and the failure of SRS to provide the services required to be provided by SRS pursuant to the Agreement either in accordance with the agreed upon payment schedule or in accordance with the payment schedule fabricated by SRS for the purpose of substantially inflating the general consulting payments has caused and continues to cause substantial loss and damage to Histogenics. As I am sure that you are aware, the overall project is substantially behind schedule, and it is the position of Histogenics that the failure of performance of SRS is the most significant reason why the overall project is behind schedule.

Accordingly, based upon the foregoing Histogenics has no alternative except to deliver to SRS immediate notice of termination of the Agreement, subject to the reservation by Histogenics of all of its rights and remedies as a result of the material breach by SRS of the Agreement and as a result of the manipulation by SRS of the payment schedule under the Agreement solely for the benefit of SRS and to the detriment of Histogenics. Histogenics did not agree to a series of payment schedules fabricated by SRS in order to inflate artificially the general consulting payments payable by Histogenics to SRS and in order to change the overall character of the Agreement from an agreement with payment based upon achieving certain milestones.

The Agreement between Histogenics and SRS is hereby terminated, and such termination is without prejudice and under reservation by Histogenics of all of its rights and remedies arising out of the material breach by SRS of the Agreement and any and all other actions of SRS in relation to Histogenics that have caused and continue to cause substantial loss and damage to Histogenics. Please understand that it is the position of Histogenics that SRS has currently been overpaid by an amount substantially in excess of $200,000.00 based upon the actual services provided by SRS, and Histogenics intends to obtain reimbursement from SRS of all amounts that constitute the overpayment by Histogenics to SRS of amounts due SRS. You are hereby instructed to refrain from having any contact whatsoever with any Histogenics employee or other representative with the exception of the undersigned. All communications regarding the termination of the Agreement and the amounts due and payable by SRS to Histogenics that constitute overpayment by Histogenics of the amounts earned by SRS shall be directed solely to the undersigned. You are further instructed to cooperate fully with Histogenics in connection with the termination of the Agreement through the provision to Histogenics of all files, information, data and all other work product generated by SRS pursuant to the Agreement or relating to the work performed by SRS for Histogenics pursuant to the Agreement (collectively, the "Work Product and Files"). Please call me upon receipt of this letter to make arrangements for the transfer of the Work Product and Files to Histogenics immediately. Please be aware that any delay in the provision by SRS to Histogenics of the Work Product and Files will cause additional damage to Histogenics, and Histogenics intends to hold SRS fully responsible for any and all such damage.

This letter is being sent to you without prejudice to and under reservation by Histogenics of all of its rights and remedies arising out of the material breach of the Agreement by SRS and the damages incurred by Histogenics as a result thereof.

Sincerely,

A. Craig Brown

ACB/vac

cc:    Laurence Berlowitz Tarrant, Ph.D.
       Dexter Stevens, CPA
       Eric Roos

192692-1

D

*(handwritten top right)* 10/9/03 cvt, mld KRR

# American Arbitration Association

Commercial _____ ARBITRATION RULES*
(Enter the name of the applicable rules)

To institute proceedings, please send two copies of this demand *and the arbitration agreement*, with the filing fee as provided in the rules, to the AAA. Send the original demand to the respondent.

## DEMAND FOR ARBITRATION

DATE: __10/8/03__

To: Name   **SRS International, Inc.**

Address   **1901 L Street NW Suite 250**

City, State   **Washington, D.C.** _____ ZIP Code **20036-3503**
(of the Party on Whom the Demand Is Made)
Telephone **(202) 223-0157** _____ Fax **(202) 835-8970**

Name of Representative   **John D. Pellegrin, Esq.**
Representative's Address   **9306 Old Keene Mill Road** (if Known)
Name of Firm (if Applicable)   **John D. Pellegrin, P.C.**
City and State   **Burke, VA** _____ ZIP Code **22015**
Telephone **(703) 455-6101** _____ Fax **(703) 455-6106**

The below named claimant, a party to an arbitration agreement contained in a written contract dated **4/11/01** and providing for arbitration under the _____**Commercial**_____ Arbitration Rules of the American Arbitration Association, hereby demands arbitration thereunder.

THE NATURE OF THE DISPUTE:  **See attached sheet.**

THE CLAIM OR RELIEF SOUGHT (the Amount, if Any):   **See attached sheet.**

TYPES OF BUSINESS: Claimant   **biotechnical** _____ Respondent   **consultant**
HEARING LOCALE REQUESTED:   **Springfield, Massachusetts**
(City and State)

DOES THE DISPUTE ARISE OUT OF AN EMPLOYMENT RELATIONSHIP?   ☐ YES   ☒ No

You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association at its **R.I.** case management center with a request that it commence administration of the arbitration. Under the rules, you may file an answering statement, within the time frame specified in the rules, after notice from the administrator.

Signed _____ Title   **Attorney**
(May be Signed by a Representative)

Name of Claimant   **Histogenics Corporation**
Address (to Be Used in Connection with This Case)   **116 Pleasant Street, Suite 19**
Name of Firm (if Applicable)
City and State **Easthampton, MA** _____ ZIP Code **01027**
Telephone **(413) 529-0796** _____ Fax **(413) 529-0685**
Name of Representative   **L. Jeffrey Meehan, Esq.**
Representative's Address **1414 Main Street, Suite 1900**
City and State **Springfield, MA** _____ ZIP Code **01144-1900**
Telephone **(413) 733-3111** _____ Fax **(413) 734-3910**

☒MEDIATION is a nonbinding process. The mediator assists the parties in working out a solution that is acceptable to them. If you wish for the AAA to contact the other parties to ascertain whether they wish to mediate this matter, please check this box or list them on the back (there is no additional administrative fee for this service).

*If you have a question about which rules apply or the address of the nearest case management center, please contact the AAA (1-800-778-7879).

Form G2-5/99

## Histogenics Corporation vs. SRS International

### NATURE OF DISPUTE:

The parties entered into an agreement whereby for compensation the respondent was to provide the claimant with services consisting of advocacy by the respondent on behalf of the claimant for the approval of a medical innovation by the Federal Drug Administration and oversight for clinical and non-clinical research management, data development, evaluation, quality assurance, and related matters pertaining to product development and regulatory approval. Histogenics terminated the agreement based on the failure of performance and material breach of the agreement by SRS International. SRS International disputes the right of Histogenics to terminate the agreement with or without cause, has refused to turn over work product to Histogenics and has asserted a substantial claim for additional compensation in conflict with the agreement. The conduct of SRS in its material breach of its agreement with Histogenics, and its refusal to release the work product constitutes an unfair and deceptive act or practice in violation of Massachusetts General Laws Chapter 93A.

### CLAIM OR RELIEF SOUGHT:

Histogenics makes demand for reimbursement in excess of $200,000 for overpayments to SRS International as a result of a manipulation of the payment schedule by the respondent, a failure of performance by the respondent and a material breach of the written agreement. Histogenics seeks recovery of all documentation, electronic data compiled, confidential information, clinical trial results and laboratory studies and results together with related records as they pertain to Histogenics TESS tissue replacement implant system. Histogenics seeks recovery for compensatory damages as well as for punitive damages and attorney's fees pursuant to Massachusetts General Laws Chapter 93A.



# SRS INTERNATIONAL CORPORATION

Suite 1000 • 1625 K Street, NW • Washington, DC 20006-1604
Telephone (202) 223-0157/0298 • Fax (202) 835-8970
E-Mail: mainsrs@srsinternational.com   http://www.srsinternational.com

## MASTER AGREEMENT FOR SERVICES BETWEEN

## HISTOGENICS CORPORATION

### AND

## SRS INTERNATIONAL CORPORATION

Histogenics Corporation, hereafter known as CLIENT, obtains the services of SRS International Corporation hereafter known as CONSULTANT, in the fields of: FDA regulatory affairs; clinical and non-clinical sciences and study design; clinical and non-clinical research management; clinical and non-clinical data development, evaluation, and quality assurance; and, related matters. CONSULTANT agrees to provide such services in accordance with the following terms and conditions:

### Article (1): Services

At times mutually agreeable to CONSULTANT and CLIENT, CONSULTANT will make available his services, commencing on the effective date of this agreement. The services provided will be as required and specified by CLIENT.

The services to be performed under this agreement will be:

(a)     as detailed in Task Orders issued pursuant to this agreement (which agreement will be incorporated into said Task Orders by reference to the present "Master Agreement") and which will be for fixed fee amounts; or,

(b)     may be consultations which are requested by CLIENT, verbally or in writing, but are of such a nature as to not be conveniently covered by any specific Task Order. In such case services will be provided as "hourly billed service" with the costs of such services  to be billed on an hourly rate as specified in Article 3, "Compensation", of this agreement and the details of such services to be provided to CLIENT at the time  of presentation of an invoice for such services. Provided, that such hourly services which are requested by CLIENT and provided to CLIENT in support of development of specific Task Orders which issue subsequent to CONSULTANT's providing these hourly services may, by mutual agreement, be credited against the fixed fee cost of the Task Order specified services.

Task Orders under this agreement are to be prepared by CONSULTANT at CLIENT's verbal or written request and will become effective when executed by CLIENT. Each such Task Order will contain a Scope of Work statement which details the services to be provided under the Task Order and provides Costs and Time Frames for completion of services under the Task Order. Time Frames for deliverables under a Task Order will be referenced to the date of approval of the Task Order by the CLIENT and other such time points as may be specified in the Task Order. Costs and Time Frames in Task Orders issued pursuant to this Agreement are predicated on the Scope of Work for each Task Order and in the event that a Scope of Work requires modification and such modification affects either Time Frame or Cost, then an Amended Task Order shall be prepared for approval by CLIENT and CONSULTANT.

## Article (2): Contract Period

This Agreement becomes effective on the date of execution by CLIENT, and will continue in effect until revoked in writing by the CLIENT. The CLIENT will provide CONSULTANT 30 days written notice of intent to revoke except if such revocation is due to completion of all required tasks. The revocation of a specific Task Order shall be subject to the same 30 days notice requirement and becomes effective 30-days after written notice is provided to CONSULTANT. In the event that a specific Task Order is revoked, save for the reason of CONSULTANT's misfeasance or CONSULTANT's failure to perform under the terms of the Task Order, CLIENT agrees to pay CONSULTANT an amount which is fair and reasonable compensation for work completed since the time of the last milestone payment payable under the specific Task Order being revoked and the effective date of revocation of the specific Task Order; such "fair and reasonable compensation" to be negotiated in good faith and expeditiously between CLIENT and CONSULTANT.

## Article (3): Compensation

Compensation for services under this agreement is to be provided for in Task Orders issued pursuant to this agreement.

## Article (4): Terms of Payment

Terms of Payment under this agreement will be as specified in Task Orders issued pursuant to this agreement.

Any Task Order specified initiation payment, progress payment, or milestone payment invoice not paid within 10 days of receipt by CLIENT and any hourly services invoice not paid within 20 days of receipt by CLIENT shall incur a monthly finance charge at the annual rate of 18%.

Invoices for initiation payments, progress payments, or milestone payments for Task Order covered services will be presented at such times as specified in the relevant Task Order. Invoices for hourly services will normally be presented at the end of each calendar month for work in that month and shall detail the nature of work done so as to support the invoicing.

In the event that CONSULTANT is required to seek legal assistance to recover from CLIENT monies which CONSULTANT alleges are owed to CONSULTANT, CLIENT agrees to reimburse CONSULTANT for the actual costs incurred by CONSULTANT in recovering any such monies, including reasonable attorneys' fees and court costs but not including CONSULTANT's time expended by CONSULTANT's personnel in support of any such recovery action; provided, that CONSULTANT shall only be entitled to be reimbursed for its reasonable attorneys' fees and court costs if CONSULTANT obtains either a judgement against CLIENT or an arbitration award for the amount that CONSULTANT claims is due from CLIENT, and in the event of a partial award or judgement CONSULTANT shall only be entitled to recover from CLIENT a pro rata portion of its attorneys' fees and court costs.

## Article (5): Independent Contractor

It is agreed that CONSULTANT shall have complete freedom as to the details, methods, and means of performing the requested services. It is further understood that CONSULTANT is retained only for the purposes and to the extent set forth in this agreement, and that CONSULTANT'S relationship to CLIENT and any of CLIENT'S subsidiary companies shall, during the period of this agreement, be that of an independent contractor. CONSULTANT'S stockholders, employees, agents, and sub-contractors shall not be considered under the provisions of this agreement or otherwise to have a status as employees of CLIENT, nor shall any such persons or parties be entitled hereafter to participate in any plans, arrangements, or distributions by CLIENT relating to any pension, deferred compensation, bonus, stock bonus, hospitalization, insurance or other benefits extended to CLIENT'S employees.

CONSULTANT shall be free to dispose of such portions of CONSULTANT'S time, energy and skill as are not obligated hereunder to CLIENT and its subsidiaries, in such manner as CONSULTANT sees fit and to such persons, firms or corporations as CONSULTANT deems advisable, so long as doing so does not create a conflict of interest between CLIENT and such other persons, firms, or corporations.

## Article (6): Confidentiality

CONSULTANT shall, both during and subsequent to providing services hereunder, be bound by the terms of the Confidentiality Agreement executed between CONSULTANT and CLIENT, which Confidentiality Agreement is incorporated herein by reference.

## Article (7): Prior Agreements

This agreement replaces any prior agreement(s) between CONSULTANT and CLIENT relative to services as a CONSULTANT with the exception of the Confidentiality Agreement cited in Article 6, above, which shall continue in effect. This agreement contains the entire understanding of the parties and they shall not be bound by any representations, warranties, promises, covenants or understandings other than those set forth herein.

## Article (8): Indemnification

The parties hereto mutually agree to indemnify each other from claims arising against either party; provided, that CLIENT is not obligated to indemnify CONSULTANT from claims arising against CLIENT to the extent that such claims result from the negligence of, misfeasance of, or misrepresentations made by CONSULTANT and CONSULTANT is not obligated to indemnify CLIENT from claims arising against CONSULTANT to the extent that such claims result from the negligence of, misfeasance of, or misrepresentations made by CLIENT.

## Article (9): Severability

In the event that any Article or Articles in this Agreement are found invalid by the court of competent jurisdiction, the remainder of this Agreement shall continue in full force and effect.

## Article (10): Dispute Resolution

In the event of disputes arising under this Agreement, the parties agree to first pursue non-binding mediation and, should the dispute not be resolved after such non-binding mediation, to then enter into binding arbitration.

**Approval of this Agreement**

    IN WITNESS WHEREOF, the said parties have hereunto set hands and seals on the day and year indicated and the signatories hereto represent and warrant that they are empowered to bind the respective parties to this agreement.


_____          4-5-01
John A. Todhunter, Ph.D.                          _____
President,                                        Date
SRS International Corporation


_____          4-11-01
Laurence J.B. Tarrant, Ph.D.                      _____
President,                                        Date
Histogenics Corporation


Master Agreement for Services Between                          Page 5 of 5
Histogenics Corporation and SRS International Corporation



# SRS INTERNATIONAL CORPORATION

Suite 1000 • 1625 K Street, NW • Washington, DC 20006-1604
Telephone (202) 223-0157/0298 • Fax (202) 835-8970
E-Mail: mainsrs@srsinternational.com  http://www.srsinternational.com

## TASK ORDER

**NUMBER:**        HISTOGENICS-00-001

**ISSUED TO:**     SRS International Corporation

**ISSUED BY:**     Histogenics Corporation

**PURSUANT TO:**   Master Agreement for Consulting Services

**DATE:**          Effective on Execution by Histogenics Corporation

## SCOPE OF WORK:

SRS International will develop and provide to the issuer of this Task Order the following materials, services, and/or work products:

- Regulatory and scientific strategic consultations;
- FDA regulatory affairs services;
- Data development program design, coordination, management, monitoring and implementation for non-clinical and clinical studies;
- Evaluation, analysis, and reporting of the results on non-clinical and clinical studies; and,
- GMP consultations

in support of the development of and FDA approval of Histogenics Corporation's TES tissue replacement implant system; such services being more specifically detailed in Attachment No. 1 to this Task Order which is incorporated herein by reference. The Scope of Work which is here stated covers the use of the TES system for use as a medical device for the indication of cartilage replacement for repair of cartilage defects in and around the knee, but exclusive of use within the synovial space.

At Histogenics Corporation's request additional Task Orders may be written in future to cover other tissue indications for the TES system (i.e., non-cartilage) and/or this Task Order may be amended to include additional specific indications for the TES system as a cartilage replacement for damaged cartilage at sites other than the knee. It is anticipated within the Scope of Work in this present Task Order, however, that the GMP qualification of the TES system's hardware and software which are used for preparatory culture and growth of the replacement tissue implant itself will be generally useful to support both Histogenics Corporation's and other parties future applications for approval of the TES system in such other indications.

TASK ORDER No. HISTOGENICS-00-001

## COSTS:

SRS will conduct the Scope of Work for the following costs:

### Base Program:

As specified in the program cost proposal submitted to Histogenics Corporation and dated November 16, 2000 and as amended per discussions between Histogenics Corporation and SRS International Corporation the Base Program cost for the above stated Scope of Work (exclusive of travel) is estimated as:

*Through Phase I Clinical Study*

| | |
|---|---|
| SRS International fees for Base Program | $ 177,273.50 |
| Non-clinical Laboratory fees for Base Program | $   57,000.00 |
| Clinical Site fees for Base Program | $ 129,500.00 |
| Base Program Subtotal 1 .......... | $ 363,773.50 |

*From Phase II/III Clinical Study and through PMA Approval*

| | |
|---|---|
| SRS International fees for Base Program | $ 594,552.13 |
| Non-clinical Laboratory fees for Base Program | $          0.00 |
| Clinical Site fees for Base Program | $1,500,000.00 |
| Base Program Subtotal 2 .......... | $2,094,552.13 |

*Complete Program From Start-up through PMA Approval*

| | |
|---|---|
| SRS International fees for Base Program | $ 771,825.63 |
| Non-clinical Laboratory fees for Base Program | $   57,000.00 |
| Clinical Site fees for Base Program | $1,500,000.00 |
| Base Program Total ................. (Subtotal 1 + Subtotal 2) | $2,328,825.63 |

The details of the above-stated Base Program cost estimates are provided in Attachment No. 2 to this Task Order which is incorporated herein by reference. This cost estimate figure is provided as a good faith estimate based on: (a) SRS Internationals' experience with data requirements and approval issues for medical implant devices; (b) SRS International's preliminary cost discussions with various laboratory service vendors with whom SRS