As such, plaintiff has brought suit[3] against defendants Histogenics, Tarrant, Roos, Tokuno, Takagi Industrial, Takagi Sangyo, Takagi, and Mizuno for breach of contract, breach of contract implied in fact and in law, promissory estoppel, unjust enrichment, action on account, and fraud. Defendants now move to dismiss, arguing that (1) this Court lacks personal jurisdiction (2) this Complaint fails to state a claim and (3) this dispute should be resolved not by litigation but by arbitration as specified in the arbitration clause contained in the Agreement.

## ANALYSIS

### Choice of law

Here the parties failed to designate which jurisdiction's law they desired to govern their Agreement. The District of Columbia Circuit, in Ideal Elec. Sec. Co. v. Int'l Fidelity Ins. Co., 129 F.3d 143 (D.C. Cir. 1997), stated that "[w]hen deciding state-law claims under diversity or supplemental jurisdiction, federal courts apply the choice-of-law rules of the jurisdiction in which they sit." Id. at 148 (citing Lee v. Flintkote Co., 593 F.2d 1275, 1278-79 n. 14 (D.C. Cir. 1979)); see Shenandoah Assoc.'s Ltd. P'ship v. Tirana, 182 F. Supp. 2d 14, 18 (D.D.C. 2001) (in a diversity action a court "is obligated under Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), to apply the choice of law rules prevailing in [the forum] jurisdiction."). Thus, District of Columbia law should be applied.

Additional support for applying D.C. law comes from the Restatement. When a contract is silent as to "which law governs their agreement, the Restatement approach requires the court to weigh various jurisdictions' contacts with the transaction at issue and to determine which has the

---

[3]On defendant Takagi Industrial's motion, the case was removed to this Court pursuant to this Court's original jurisdiction created by 28 U.S.C. § 1332 (2000) (diversity of citizenship).

most substantial interest in the matter." Ideal Elec. Sec., 129 F.3d at 148 (citing Restatement

(Second) of Conflict of Laws § 188). Normally, in the District of Columbia in cases involving

contract disputes, the test drawn from the Restatement governs choice-of-law analysis. Booker v.

Robert Half Int'l Communications Workers of Am., Inc., 315 F. Supp. 2d 94, 98 n 1 (D.D.C.

2004).

The Restatement (Second) § 188 states that in the absence of an "effective choice of law

by the parties. . . the contacts to be taken into account" include: (a) the place of contracting, (b)

the place of negotiation of the contract, (c) the place of performance, (d) the location of the

subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation

and place of business of the parties.

In the instant case, the performance of the contract thus far occurred in the District of

Columbia before the FDA, and the plaintiff's place of business is in the District. Additionally, a

series of meetings between the parties concerning the execution of the Agreement, Task Order,

and subsequent amendments all took place in the District of Columbia. Compl. ¶ 15. As such, it

is appropriate for this Court to apply District of Columbia law in this case.

**Motion to Dismiss as to Corporate Defendant Histogenics**

Defendant Histogenics filed a motion on the grounds of the Federal Arbitration Act as to

all seven counts of the Complaint and also on the grounds of Rule 12(b)(6) as to four of the

seven counts in the Complaint.

### 1. The Federal Arbitration Act

The Federal Arbitration Act ("FAA") states, in relevant part: "A written provision in . . . a

contract evidencing a transaction involving commerce to settle by arbitration a controversy

7

thereafter arising out of such a contract or transaction . . . shall be valid, irrevocable, and

enforceable, save upon such grounds as exist at law or in equity for the revocation of any

contract." 9 U.S.C. § 2. When it enacted the Arbitration Act, Congress intended to "revers[e]

centuries of judicial hostility to arbitration agreements" by "placing arbitration agreements 'upon

the same footing as other contracts.'" Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 24

(1991).

The FAA creates a strong federal[4] presumption in favor of arbitration of disputes. This

"liberal federal policy favoring arbitration agreements, manifested by. . . the [FAA] as a whole, is

at bottom a policy guaranteeing the enforcement of private contractual arrangements." Robert

Half Int'l, 315 F. Supp. 2d at 97 (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,

Inc., 473 U.S. 614, 625 (1985)). Succinctly put, the rule is that

> [w]here the contract contains an arbitration clause, there is a presumption of
> arbitrability in the sense that an order to arbitrate the particular grievance should not
> be denied unless it may be said with positive assurance that the arbitration clause is
> not susceptible of an interpretation that covers the asserted dispute.

AT & T Tech.'s, Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986).

Arbitration should be ordered unless it can be said with certainty that the arbitration provision

cannot be interpreted to cover the dispute. Robert Half Int'l, 315 F. Supp. 2d at 97 (citations

omitted).

However, "the presumption in favor of arbitration is applicable to issues regarding the

---

[4]Variously called a presumption, preference or policy, the rule favoring arbitration is
identical under the D.C. Uniform Arbitration Act, D.C. Code § 16-4301 to 16-4319 (1989), and
the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (1996). Masurovsky v. Green, 387 A.2d 198, 201
(D.C. 1997) (remanding to trial court to determine if a second agreement was integrated without
regard to the presumption in favor of arbitration).

8

interpretation or construction of an agreement containing an arbitration clause, but not to issues of the existence of an agreement to arbitrate.[5]  Masurovsky v. Green, 687 A.2d 198, 200 (D.C. 1997). Furthermore, the Supreme Court emphasized that the first principle of arbitrability is that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." AT & T Tech.'s, Inc., 475 U.S. at 648 (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)); Davis v. Chevy Chase Financial, Ltd., 667 F.2d 160, 165 (D.C. Cir. 1981). Parties cannot be required to arbitrate unless they have agreed to do so, and the authority of arbitrators to resolve disputes is derived from the agreement of parties to engage in arbitration.  Robert Half Int'l, 315 F. Supp. 2d at 97 (citations omitted).

The Supreme Court has made it clear that the courts, not arbitrators, are to determine whether the parties have agreed to arbitrate a particular matter. Masurovsky, 387 A.2d at 204. See also, National R.R. Passenger Corp. v. Boston & Maine Corp., 850 F.2d 756, 759 (D.C. Cir. 1988) ("the question of arbitrability – whether [an agreement] creates a duty for the parties to arbitrate [a] particular grievance – is undeniably an issue for judicial determination") (quoting AT & T Tech.'s, Inc., 475 U.S. at 649); Robert Half Int'l, 315 F. Supp. 2d at 97 ("a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of

---

[5]The Masurovsky court stated that the presumption in favor of arbitration attaches only after the trial court has determined that a valid agreement to arbitrate exists. Put another way, "the scales tip in favor of arbitration when we construe an arbitration clause, but only after we find, as an initial matter, that an enforceable arbitration clause exists." Masurovsky, 387 A.2d at 205 (citing Adamovic v. METME Corp., 961 F.2d 652, 654 (7th Cir. 1992). Also, in Kaplan, the Third Circuit did not apply any presumption of arbitration in determining whether the Kaplans had agreed to arbitrate the merits. See Kaplan v. First Options of Chicago, Inc., 19 F.3d 1503, 1512 (3d Cir. 1994), aff'd, 514 U.S. 938 (1995).

arbitrability' for a court to decide") (quoting Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84 (2002)); Bailey v. Fed. Nat'l Mortgage Ass'n, 209 F.3d 740, 746 (D.C. Cir. 2000) ("the determination of whether the parties have consented to arbitrate is a matter to be determined by the courts on the basis of the contract between the parties").

In fact, the D.C. Circuit observed that allowing the courts to determine arbitrability is consistent with the policy favoring arbitration. The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be drastically reduced [if the arbitrator] had the power to determine his own jurisdiction. Similarly, if we allow the federal policy favoring arbitration . . .to override the will of the parties by giving the arbitration clause greater coverage than the parties intended, then in the long run we risk undermining rather than serving that policy. Boston and Maine Corp., 850 F.2d at 760-61 (quotations omitted). "[I]f we allow such questions [of scope of the Arbitration clause] to be arbitrated, then the willingness of parties to enter into arbitration agreements may be 'drastically reduced' out of fear that arbitrators will tend to have an over-expansive view of their jurisdiction." Id. at 762.

If the court concludes that there was an agreement to arbitrate the relevant dispute, then it must assess "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." Robert Half Int'l, 315 F. Supp. 2d at 97-98 (quoting Mitsubishi Motors Corp., 473 U.S. at 625). If an arbitration agreement is valid and enforceable, the Court "shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."Robert Half Int'l, 315 F. Supp. 2d at 99 (quoting 9 U.S.C. § 4).

Finally, this district sets forth the burdens that parties bear with respect to enforcing arbitration clauses. "[T]he party asserting the existence of a contract [to submit disputes to

10

arbitration] has the burden of proving its existence." <u>Robert Half Int'l</u>, 315 F. Supp. 2d at 99

(quoting <u>Bailey</u>, 209 F.3d at 746). However, "[t]he party resisting arbitration [<u>i.e.</u>, plaintiff]

bears the burden of proving that the claims at issue are unsuitable for arbitration." <u>Robert Half</u>

<u>Int'l</u>, 315 F. Supp. 2d at 99 (quoting <u>Nelson v. Insignia/Esg, Inc.</u>, 215 F. Supp. 2d 143, 150)).

### 2. Whether the Federal Arbitration Act Bars These Claims Against Histogenics

In the instant case, the arbitration clause in the Agreement states, "In the event of disputes

arising under this Agreement, the parties agree to first pursue non-binding mediation and, should

the dispute not be resolved after such non-binding mediation, to then enter into binding

arbitration." Compl. Ex. 1. To resolve the issue of dismissal of defendant Histogenics based

upon the FAA, this Court must determine two questions (1) whether the parties intended to enter

into an arbitration clause, and (2) whether the arbitration clause should be interpreted to apply to

the disputes <u>in this case</u>, so as to necessitate the dismissal of the claim against defendant

Histogenics.

### a. The Parties Entered into A Valid Arbitration Clause

As an initial matter, when a contract is facially unambiguous, its language provides the

best objective manifestation of the parties' intent. Whether a contract is ambiguous is a question

of law for the court. <u>Robert Half Int'l.</u>, 315 F. Supp. 2d at 101 n.2. In interpreting contractual

terms, the court must adhere to the objective law of contracts,

> whereby the written language embodying the terms of an agreement will govern the
> rights and liabilities of the parties, irrespective of the intent of the parties at the time
> they entered the contract, unless the written language is not susceptible of a clear and
> definite undertaking, or unless there is fraud, duress or mutual mistake.

<u>Potomac Elec. Power Co. v. Mirant Corp.</u>, 251 F. Supp. 2d 144, 148 (D.D.C. 2003) (quoting

11

Marra v. Papandreou, 59 F. Supp. 2d 65, 76 (D.D.C. 1999); see also, NRM Corp. v. Hercules, Inc., 758 F.2d 676, 681-82 (D.C. Cir. 1985) ("where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties"); Isaac v. First Nat'l Bank of Maryland, D.C., 647 A.2d 1159 (D.C. 1994) (holding that a party faced with a clear written agreement must allege and prove fraud, duress, or mutual mistake to negate the disputed provision).

A contract is ambiguous when it or its provisions are reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings. Conversely, a contract is unambiguous when a court can ascertain the contract's meaning by merely looking at the contract. Potomac Elec. Power Co., 251 F. Supp. 2d at 148-49. "In deciding whether contract language is susceptible of a clear meaning, the court conducts a reasonableness inquiry. Toward that end, the court looks beyond the language itself and determines what a reasonable person in the position of the parties would have thought the disputed language meant." Id., 251 F. Supp. 2d at 149. Finally, under the reasonableness approach, the court assumes that the objective reasonable person assessing the contract's language knows "all the circumstances before and contemporaneous with the making of the agreement." Id. at 149 (quoting Patterson v. District of Columbia, 795 A.2d 681, 683 (D.C. 2002)).

In the instant case, the Court finds that the under the reasonableness inquiry, there is nothing ambiguous about the arbitration clause in the contract here. The Agreement states that "[i]n the event of disputes arising under this Agreement, the parties agree to first pursue non-binding mediation and, should the dispute not be resolved after such non-binding mediation, to then enter into binding arbitration."

12

The Court finds that a reasonable person in the position of the contracting parties would have thought this arbitration clause to mean that all "disputes under the Agreement" should be arbitrated. Indeed, the Court can not readily think of any meaning other than that arbitration is required for disputes arising from the Agreement. Also, plaintiff has not alleged that any fraud, duress, or mutual mistake surrounded the formation of this arbitration clause. The Court should give effect to arbitration clauses in freely-negotiated contracts. As such, the Court determines that the arbitration clause is valid.

However, the plaintiff does not argue that no agreement to arbitrate was entered by the parties. Rather, plaintiff argues that the arbitration clause was not intended to cover the issues that form the basis of the claims here. Thus, the issue before the Court with respect to Defendants Histogenics is whether this dispute over defendant Histogenics' alleged misconduct regarding the seven counts in the Complaint falls within the scope of the Agreement's arbitration clause.

### b. The Arbitration Clause Should Apply to the Claims Here and the FAA Bars These Claims Against Histogenics

This jurisdiction has previously determined in numerous contract cases that the presence of a broad arbitration clause required a court to enforce such arbitration clauses. Robert Half Int'l, 315 F. Supp. 2d at 94 (granting defendant employer's motion to dismiss and to compel arbitration where arbitration clause in employment agreement stipulated that "any dispute or claim arising out of or relating to Employee's employment. . . shall be submitted to arbitration"); Nur v. K. F. C., USA, Inc., 142 F. Supp. 2d 48 (D.D.C. 2001) (holding that employee's claims fell within scope of binding arbitration agreements which covered "any claims that arise between

13

[plaintiff] and KFC . . . includ[ing] any concerning compensation, employment. ., or termination of employment"); <u>Brown v. Wheat Sec., Inc.</u>, 101 F. Supp. 2d 1 (D.D.C. 2000) (claim was subject to arbitration where employee signed provision in which he agreed to arbitrate any claim required to be arbitrated by the National Association of Securities Dealers Code of Arbitration Procedure); <u>Finegold, Alexander & Assoc.'s, Inc. v. Setty & Assoc.'s, Ltd.</u>, 81 F.3d 206 (D.C. Cir. 1996) (reversing lower court and finding that subcontractor's claims were arbitrable where subcontract stipulated that "any dispute or any controversy. . . had to be resolved through binding arbitration); <u>Organizing Comm. for the 1998 Goodwill Games, Inc. v. Goodwill Games, Inc.</u>, 919 F. Supp. 21 (D.D.C. 1995) (finding that motion to compel arbitration should be granted and the decision to terminate contract based on alleged material breach was arbitrable); <u>Southland Corp. v. Godette</u>, 793 F. Supp. 348 (D.D.C. 1992) (requiring franchisor to arbitrate claims of breach of contract, fraud, embezzlement and related claims under arbitration clause in franchise agreement); <u>Weatherly Cellaphonics Partners v. Hueber</u>, 726 F. Supp. 319 (D.D.C. 1989) (finding that claims were required to be arbitrated where arbitration clause provided that "any disputes under this Agreement which cannot be resolved by the Parties shall be resolved by resort to the offices of the American Arbitration Association in Washington, D.C., and its rules and regulations applicable to commercial disputes).

In fact, there is a long line of cases that shows that the presumption of arbitrability applies to commercial contracts with broad arbitration clauses. See <u>Mitsubishi Motors Corp.</u>, 473 U.S. at 617, 624-27 & n. 13 ("[a]ll disputes, controversies or differences which may arise out of or in relation to [certain specified Articles] or for the breach thereof"); <u>Pearce v. E.F. Hutton Group, Inc.</u>, 828 F.2d 826, 828, 829 (D.C. Cir. 1987) ("any controversy. . . arising out of my

14

employment or the termination of my employment"); <u>Schacht v. Beacon Ins. Co.</u>, 742 F.2d 386, 391 (7th Cir. 1984) (any difference of opinion . . . with respect to the interpretation of this Agreement or the performance of the respective obligations of the parties").

The essence of SRS' argument is that arbitration must be with the consent of the parties and that there was no intent on SRS' part to have a termination of the contract itself determined by arbitration. Pl.'s Opp'n. to Def.'s Mot. to Dismiss P 10. Plaintiff asserts that

> unilateral termination and breach. . .by Defendants [does not] give rise to any invocation of a mediation/arbitration requirement. Mediation/arbitration covered the parties' clear intent that matters falling within or "under" the scope of the Agreement; i.e., particular tasks and the performance thereof, might be the subject of mediation/arbitration – not unilateral termination and breach by one party – here Defendants.

Compl. at ¶ 41. SRS basically distinguishes defendants' alleged acts of unilateral termination, breach of contract, fraud, and related claims from what is actually covered by the arbitration clause and insists that they do not fall "under" the scope of the Agreement. Pl.'s Opp'n. to Def.'s Mot. to Dismiss P 10. Plaintiff's argument is unpersuasive for four reasons.

First, the arbitration clause before the Court, which covers "disputes under this Agreement", is at least as broad as the arbitration clauses at issue in the cases cited above. <u>See,</u> <u>Weatherly Cellaphonics Partners</u>, 726 F. Supp. 319 (D.D.C. 1989) (stating that the Court will not unduly restrict the scope of an arbitration clause merely because it is short and to the point and not filled with "lawyer-like" language employing three or four synonyms for every significant concept).

Second, contrary to the plaintiff's belief that a distinction exists between unilateral termination and matters "under" the arbitration clause, courts have explicitly ruled that the

15

termination of the contract itself is an issue that falls within the scope of the arbitration clause. Boston and Maine Corp., 850 F.2d at 762 ("[when] faced with. . . broader arbitration clause[s],. . .such as one providing generally. . . that disputes 'arising under" . . . the contract are to be arbitrated, we will presume that disputes over the termination or expiration of the contract should be submitted to arbitration). See also, Zandford v. Prudential-Bache Sec., Inc., 112 F.3d 723 (4th Cir. 1997) (stating that an agreement to arbitrate survives the termination of employment and covers the arbitration of wrongful termination claims).

Third, the Supreme Court case in which arbitration was not enforced against individuals who were not a party to the contract is distinguishable from the instant case. In E.E.O.C. v. Waffle House, Inc., the Supreme Court stated that the policy goals of the FAA do not require the E.E.O.C. to relinquish authority it has not agreed to relinquish, and that a contract cannot bind a nonparty. E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 294 (2002) (citations omitted). This case is distinguishable from Waffle House because the plaintiff can not assert that it is not a party to the contract.

Fourth, the Court fails to comprehend how this dispute could be beyond the scope of the Agreement when the Agreement provides the only basis for any of SRS claims against Histogenics and other defendants. After all, SRS' allegations of fraud, breach of contract, action on account, promissory estoppel, breach of implied contract in fact and in law, and unjust enrichment all revolve around redressing defendants' alleged failure to follow through on the contract by unilaterally failing to pay SRS.

In fact, plaintiff's interpretation of the Agreement would permit a party to bypass arbitration of the issues of contract breach, fraud and related claims, and proceed directly to

16

termination of the entire agreement simply because it unilaterally claims that there has been a

material breach. The existence of such a right would thwart the parties' intent to make "disputes

arising under this Agreement" subject to arbitration. SRS cannot now simultaneously seek to

enforce against the Defendants some of the terms of the Agreement it bargained for while

avoiding being itself bound by other terms. Put simply, if SRS wants to claim rights under a

contract – the Agreement – then it must also be bound by a perfectly valid provision of that

contract – the broadly drawn arbitration clause.

The Court concludes therefore that the decision to terminate by Histogenics is arbitrable.

Thus, the motion to dismiss as to Histogenics shall be GRANTED on all counts on grounds of

the FAA. Consequently, the Court need not consider defendant's motion to dismiss on the

grounds of Rule 12(b)(6).

### Motion to Dismiss as to Corporate Defendants Takagi Industrial and Takagi Sangyo and as to Individual Defendants Roos, Tokuno, Takagi, and Mizuno

Defendants the Japanese corporations Takagi Industrial and Takagi Sangyo, and the

individuals Roos, Tokuno, Takagi, and Mizuno filed motions to dismiss on the grounds of Rule

12(b)(2), Rule (12)(b)(6) and the FAA as to all seven counts of the Complaint.

#### 1. Rule 12(b)(2) Motion to Dismiss

##### a. Legal Standard for Rule 12(b)(2)

Plaintiff has invoked the D.C. Long Arm statute, D.C. Code § 13-423. D.C. Code § 13-

423 provides for specific jurisdiction because plaintiff's claim arises from the defendant's

"transacting any business in the District of Columbia." See Compl. ¶ 10; Arista Records, Inc. v.

Sakfield Holding Co., 314 F. Supp. 2d 27, 30 (D.D.C. 2004) (Lamberth, J.). Also, the assertion

17

of general jurisdiction must meet the constitutional minimum required for due process. <u>Arista Records</u>, 314 F. Supp. 2d at 30.

Exercising personal jurisdiction over a nonresident defendant will not violate the due process clause if the defendant has "minimum contacts" with the District of Columbia such that the exercise of personal jurisdiction will not offend the "traditional notions of fair play and substantial justice." <u>Shapiro, Lifschitz & Schram, P.C. v. Hazard</u>, 90 F. Supp. 2d 15, 20 (D.D.C. 2000) (citing <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945)). This "minimum contacts" requirement must be met with respect to each defendant. <u>Id.</u>

To determine whether the exercise of personal jurisdiction over nonresident defendants satisfies <u>Int'l Shoe's</u> "traditional notions," this Court considers two issues: first, whether nonresident defendants have "minimum contacts" with D.C., and second, whether exercising jurisdiction over nonresident defendants would be reasonable. <u>See</u>, <u>United States v. Philip Morris Inc.</u>, 116 F. Supp. 2d 116, 129 (D.D.C. 2000).

Specifically, a defendant has minimum contacts with a jurisdiction when it has "purposefully directed [its] activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." <u>Philip Morris Inc.</u>, 116 F. Supp. 2d at 129 (citing <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472-73 (1985)).

Finally, to prevail on a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing of pertinent jurisdictional facts. <u>Philip Morris Inc.</u>, 116 F. Supp. 2d at 121. In determining whether a basis for the exercise of personal jurisdiction exists, "factual discrepancies appearing in the record must be resolved in favor of the plaintiff. <u>Id.</u> (citing <u>Crane v. New York Zoological Soc.</u>, 894 F.2d 454, 456 (D.C. Cir. 1990)). However, when personal

18

jurisdiction is challenged, the plaintiff "cannot rest on bare allegations or conclusory statements

and must allege specific facts connecting each defendant with the forum." Helmer v. Doletskaya,

290 F. Supp. 2d 61, 66 (D.D.C. 2003).

### b. This Court Lacks Personal Jurisdiction Over Defendants Takagi Industrial, Takagi Sangyo, Takagi, Mizuno, Roos, and Tokuno Unless They are Alter Egos

In the instant case, plaintiff alleges that as to Takagi Sangyo, Takagi, Tokuno and

Mizuno, they were

> all involved at executive levels with Defendant Takagi Industrial, holder of the drug
> patent assigned to Histogenics and they, . . . were admittedly the principal financial
> source for Histogenics. . . As such, they all had sufficient and continuing contacts
> with D.C. – knowing that SRS would be conducting the major portion of its work
> here in D.C. – such to 'reasonably anticipate being hailed before the D.C. courts.'

Pl.'s Opp'n. to Mot. to Dismiss at P 6.  (citation omitted).

Plaintiff further alleges that "[o]ne or more of the Defendants and/or their

representatives/agents/officers requested meetings with SRS in the District of Columbia and met

in the District of Columbia at SRS's offices with principals and representatives of Plaintiff on

several occasions with respect to SRS's engagement by Defendants and work on Defendants'

behalf." Compl. ¶ 10.

The Japanese Corporate defendants (Takagi Sangyo and Takagi Industrial) and the

Japanese individual defendants (Takagi and Mizuno) display none of the fundamental indicators

of a company with activities in the District of Columbia.  They do not contract to supply services

in the District of Columbia.  They are not licensed or qualified to transact business in the District

of Columbia.  In short, there is no evidence that the Japanese corporate or individual defendants

purposefully targeted their activities at the residents of the District of Columbia.

19

Therefore, exercising personal jurisdiction over them would violate the fundamental requirements of due process. Because the Japanese defendants have no minimum contacts with this forum, there is no need to proceed to the next step of the due process test to consider whether the exercise of jurisdiction would be reasonable. See, e.g., Philip Morris Inc., 116 F. Supp. 2d at 130.

For the reasons above, this Court lacks personal jurisdiction over the Japanese corporate defendants under the D.C. Long Arm statute. Thus, the 12(b)(2) motion should be granted unless the defendants are merely alter egos of Histogenics.

Plaintiff further argues that this Court has personal jurisdiction over individual defendants Roos and Tokuno pursuant to D.C. Code § 13-423, the D.C. long arm statute. Pl.'s Opp'n. to Mot. to Dismiss at 5. Specifically, plaintiff states that Roos and Tokuno were present in D.C. with respect to the matter under dispute", and that they "were involved in the subject matter of this dispute. . .the very process SRS. . . was hired to consult and accomplish." Id. at 6.

However, "[p]ersonal jurisdiction over employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity." Wiggins v. Equifax, Inc., 853 F. Supp. 500, 503 (D.D.C. 1994) (Lamberth, J.). See also, Pollack v. Meese, 737 F. Supp. 663, 666 (D.D.C. 1990).

Furthermore, this Court finds that plaintiff's assertions do not demonstrate the required "minimum contacts" between Roos and Tokuno and the District of Columbia. See, Mitchell Energy Corp. v. Mary Helen Coal Co., 524 F. Supp. 558, 564 (D.D.C. 1981) ("[S]ingle contacts within the jurisdiction which are insignificant in the scheme of the parties' dealings will not

20

support jurisdiction"). As such, plaintiff's allegations that Roos and Tokuno were present in

meetings are insufficient to establish jurisdiction over Roos and Tokuno. Therefore, barring a

finding that the Court should pierce the corporate veil and hold Roos and Tokuno liable for

Histogenics' wrongdoing, all counts against Roos and Tokuno should be dismissed for lack of

personal jurisdiction.

               **c. The Defendants Takagi Industrial, Takagi Sangyo, Takagi, Mizuno, Roos and Tokuno Are Not Alter Egos, This Court Lacks Personal Jurisdiction to Hear Claim; Complaint on All Counts Must Be Dismissed**

Although a defendant corporation's contacts with a forum may not be attributed to

affiliated corporations, an exception to this rule exists when the party contesting jurisdiction is

found to be nothing more than the alter ego of an affiliated corporation over which the court does

have jurisdiction. Johnson-Tanner v. First Cash Fin. Serv.'s, Inc., 239 F. Supp. 2d 34, 38

(D.D.C. 2003) (citations omitted). In such cases, the foreign parent will be found to be

transacting business in the forum state through the activities of its subsidiary. Id. As applied

here, the Court has jurisdiction over the Japanese corporations, Takagi Sangyo and Takagi

Industrial, only if they are no more than alter egos of Histogenics. Furthermore, the Court has

jurisdiction over the individual defendants, Takagi, Mizuno, Roos and Tokuno only if the

corporate veil should be pierced and if individuals should be held liable for the corporation's

wrongdoings.

In the District of Columbia, the acts and obligations of the corporate entity will not be

recognized as those of a particular person or affiliate corporation[6] until the party seeking to

---

     [6]Affiliated corporations should be held liable for a corporation's wrongdoing if the affiliated corporation is merely an "alter ego" of the parent company. The standards used by courts are identical with regard to corporate veil piercing and to finding an alter ego.

21

disregard the corporate entity has proved by affirmative evidence [7] that (1) there is unity of

ownership and interest such that the separate personalities of the corporation and the individual

(or affiliate corporation) no longer exists,[8] and (2) whether an inequitable result would follow if

the Court treats Histogenics' allegedly wrongful acts as those of Histogenics alone and not also

those of other defendants.[9] Flynn v. Thibodeaux Masonry, Inc., 311 F. Supp. 2d 30, 41 (D.D.C.

---

[7]This Court takes note of prior decisions requiring plaintiff's to include in their pleadings
those elements present that warrant a veil piercing. See, Bd. of Tr's. of Teamsters Local 863
Pension Fund v. Foodtown, Inc., 296 F.3d 164, 171 (3d Cir. 2002) (explaining that a successful
claim for liability on a piercing the corporate veil theory would require the plaintiff to show that
elements needed for piercing the veil are present); De Jesus v. Sears, Roebuck & Co., Inc., 87
F.3d 65, 70 (2d Cir. 1996) (concluding that trial court properly granted a 12(b)(6) dismissal of
defendant when plaintiff failed to plead facts to support the assertion that court should pierce the
corporate veil). But see, Melikian v. Corradetti, 791 F.2d 274, 281-82 (3d Cir. 1986) (finding the
trial court erred in dismissing the count related to veil piercing for failure to state a claim when
plaintiffs' complaint provided 11 specific facts to support allegation that individual defendants
used the corporate form to defraud plaintiffs).

[8]Relevant to the first question is the issue of the degree to which formalities have been
followed to maintain a separate corporate identity. Labadie Coal Co., 672 F.2d at 96. Stated
differently, the corporate form is respected unless the corporation's owners "have so dominated
or disregarded [the corporation's] corporate form that [the corporation] primarily transacted [the
owner's] business rather than its own corporate business." Minpeco S.A. v. Contincommodity
Services, Inc., 549 F. Supp. 857, 859 (S.D.N.Y. 1982) (quoting Kirno Hill Corp. v. Holt, 618
F.2d 982, 985 (2d Cir. 1980)); see also, Solomon v. Klein, 770 F.2d 352 (3d Cir. 1985) (listing
relevant factors in determining when to pierce the corporate veil); e.g., United States v. BCCI
Holdings, S.A., 795 F. Supp. 477 (D.D.C. 1992). See also, Johnson-Tanner, 239 F. Supp. 2d at
38-39 (D.D.C. 2003) (stating that an additional factor is whether the subsidiary corporation is
operated as a mere division of the parent and whether there were transfers of personnel back and
forth between the parent corporation and its affiliate).

[9]The second question looks to the basic issue of fairness under the facts. Labadie Coal
Co., at 96. A corporate entity may be disregarded in the interest of public convenience, fairness,
and equity. Material Supply Intern. v. Sunmatch Industrial Co., 62 F. Supp. 2d 13, 21 (D.D.C.
1999); U.S. v. Bestfoods, 118 S. Ct. 1876 (1998) (explaining that the corporate veil may be
pierced when, inter alia, the corporate form would otherwise be misused to accomplish certain
wrongful purposes). The decision to pierce will be influenced by considerations of who should
bear the risk of loss and what degree of legitimacy exists for those claiming the limited liability
protection of the corporation. Diamond Chem. Co. v. Atofina Chem's., Inc., 268 F. Supp. 2d 1, 7

2004); Johnson-Tanner, 239 F. Supp. 2d at 38; Diamond Chem. Co. v. Atofina Chem's., Inc., 268 F. Supp. 2d 1, 7 (D.D.C. 2003); U.S. ex. rel. Siewick v. Jamison Sci. and Eng'g, Inc., 191 F. Supp. 2d 17, 21 (D.D.C 2002); Labadie Coal Co. v. Black, 672 F.2d 92, 96 (D.C. Cir. 1982); McAuliffe v. C and K Builders, 142 A.2d 605, 607 (D.C. Mun. App. 1958).

The Court finds the plaintiff's argument here unconvincing as to the first prong of the test for piercing the corporate veil. Plaintiff alleges that, "[t]he Japanese Defendants are executives of Takagi International, "who admittedly owns [sic] the patent, licensed it to Defendant Histogenics, and is the principal investor in Histogenics." Pl.'s Opp'n. to Mot. to Dismiss at P 8. Plaintiff alleges that "it is clear that there is the very 'unity of interest and ownership between Histogenics," Id. at 9, and states that "the[] patent rights [in the TESS process] have been assigned to Histogenics." Compl. ¶ 9. Plaintiff further alleges that "[t]he power and control of the purse strings/financing as well as the seminal patent/license and Defendants' course of conduct in their continuing efforts to delay payments to SRS. . . , has to be in large part at the behest of the 'principal investor' – Takagi Industrial and its executives." Id.

However, the statement regarding the patent right transfer is insufficient to show a unity of interest with respect to corporate ownership, as manifested by: a failure to maintain adequate corporate records, a failure to maintain corporate formalities for issuance or subscription to stock, a commingling of corporate funds, a diversion of the corporation's funds to non-corporate uses such as personal uses, or the use of the same office or business location by the corporation and its

---

(D.D.C. 2003). Furthermore, the plaintiff bears the burden of demonstrating that some injustice or inequity will result from recognition of the corporate entity and in balancing the equities, considerable weight is attached to the respect given the corporate form by the corporation's officers and shareholders. Van Diviner, 822 F.2d at 965.

23

individual shareholders. Labadie Coal Co., at 97-99; Flynn, 311 F. Supp. 2d at 41; but see, I.A.M.Nat'l Pension Fund v. Wakefield Indus., 699 F.2d 1254 (D.C. Cir. 1983) (concluding that the corporations were not really separate entities where the parent assumed the subsidiary's obligations and managed its assets out of its home office). Furthermore, plaintiff's assertion that Histogenics delay of payment had "to be in large part at the behest" of the Japanese corporation and its officers is largely conclusory and plaintiff fails to support this assertion with the factual record.

As to the second prong of the test, plaintiff simply alleges that "adhering to the fiction of defendants' separate existence would otherwise sanction fraud or promote injustice.'" Pl.'s Opp'n. to Defs.' Mot. to Dismiss at P 9. Yet, again, plaintiff does not substantiate this statement with any specific facts. As such, plaintiff fails to meet the burden of alleging more than "bare allegations supporting its argument. Material Supply, 62 F. Supp. 2d at 19. "A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." Palda v. Gen. Dynamics Corp., 47 F.3d 872, 875 (7th Cir. 1995).

Based on the foregoing, the Court concludes that these defendants can not be held liable as an alter ego for Histogenics' alleged failure to uphold contractual responsibilities. This forecloses the last possible way in which the Court could exercise personal jurisdiction over the Japanese corporations, its employees, and Histogenics' employees. Because the Court finds that it lacks personal jurisdiction over defendants Takagi Industrial, Takagi Sangyo, Takagi, Mizuno, Roos, and Tokuno, the Court need not consider defendants' other grounds for dismissal, including the Rule 12(b)(6) motion and the dismissal motion based on the FAA. Defendants' motion to dismiss on the basis of Rule 12(b)(2) shall be granted as to all seven counts of the

24

Complaint.

**Motion to Dismiss as to Individual Defendant Tarrant**

Defendant Tarrant has filed a motion to dismiss all seven counts of the Complaint on the

basis of the FAA, and to dismiss six counts of the Complaint on the basis of Rule 12(b)(6).

**a. Counts 1 and 7 Should be Dismissed Because the Claims Should be Submitted to Arbitration**

For the reasons stated previously regarding the Agreement's arbitration clause, this Court

determines that the breach of contract claim (Count 1) and the fraud claim (Count 7) as against

Defendant Tarrant should be dismissed on the grounds of Rule 12(b)(6) in favor of arbitration of

those claims. See Fischer v. NWA, Inc., 883 F.2d 594, 600-01 (8th Cir. 1989) (affirming district

court's dismissal of claims, including fraud, because plaintiff failed to comply with mandatory

arbitration clause); Thompson v. Lee, 589 A.2d 406, 411 (D.C. 1991) ("Courts often refuse to

reach the merits of the claims of fraudulent inducement and require that those issues be resolved

by the arbitrator when the arbitration clause has a broad scope and the clause itself is not a

product of fraud"); Weatherly Cellaphonics Partners, 726 F. Supp. at 321-22 & n. 4 (D.D.C.

1989) (finding arbitration clause applied to plaintiff's breach of contract and fraud claims where

the "[a]greement provide[d] the only basis for any of [plaintiff's] claims against [defendant]).

Thus, defendant Tarrant's motion to dismiss Counts 1 and 7 shall be granted.[10]

---

[10]The Court takes notice that in addition to dismissing the claim as against defendant Tarrant in favor of arbitration of those claims, there exists another reason to dismiss. The alternative holding is that because the acts performed by defendant Tarrant were carried out in his corporate capacity as the president of defendant Histogenics, personal jurisdiction does not exist as to defendant Tarrant. See Wiggins, 853 F Supp. at 503. Besides dismissal in favor of arbitration, this claim should also be dismissed pursuant to Rule 12(b)(2), notwithstanding defendant counsel's failure to make mention of this in the motion to dismiss.

25

**b. Counts 2 - 6 Should be Dismissed Because Plaintiff Has Failed to Allege Facts Sufficient to Show that Corporate Officer Tarrant Should be Held Liable for Histogenics' Contractual Responsibilities.**

In light of the previously mentioned standard that plaintiffs must reach to successfully plead a case for piercing the corporate veil, the Court now turns to consider plaintiff's assertions with respect to defendant Tarrant. Plaintiff alleges that, "Defendant Tarrant, individually and as officer, board member, agent, employee, representative, and/or alter ego of Defendant Histogenics falsely represented to Plaintiff. . . that Plaintiff would be fully paid and thereby induced Plaintiff to make itself available. . ." Compl. ¶ 76. Plaintiff further alleges that, "Defendant Laurence Tarrant. . . insisted on. . . arbitration provisions being added to the proposed Master Agreement just before he entered into the contract on behalf of the Defendants. To that end, Tarrant himself dictated the specific terms. . . during these final negotiations of the. . .Master Agreement." Pl.'s Opp'n. to Defs.' Mot. to Dismiss P 14.

This sparse factual record concerning Tarrant's relationship with Histogenics hardly contains anything but conclusory statements that Tarrant is an alter ego. No facts support an allegation that a unity of interest exists between Tarrant and Histogenics such that the corporate veil should be pierced. Furthermore, plaintiff has also failed to plead specific facts to show that an injustice will result if the alleged liability of Histogenics is not imputed to Tarrant. In fact, the only specific action by Tarrant described in the Complaint is Tarrant's negotiation of a term in the contract in his official, corporate capacity. As such, Counts 2-6 (implied contract-in-fact, implied contract-in-law, promissory estoppel, quantum meruit, and action on account) shall be dismissed as to defendant Tarrant.

**CONCLUSION**

26

For the foregoing reasons, the Court shall GRANT defendants Histogenics Corporation,

Laurence J.B. Tarrant, Eric Roos, Takagi Industrial Company, Takagi Sangyo, Takao Takagi,

Toshimasa Tokuno, and Shuicki Mizuno's motion to dismiss [3] as to all seven counts of the

Complaint.[11]

A separate order shall issue this date.


Signed by Royce C. Lamberth, United States District Judge, on August 16, 2004.

---

[11]Although plaintiff filed the original complaint filing suit for seven separate causes of action, the Court recognizes that in the plaintiff's opposition memorandum, plaintiff pleads that all defendants should be liable for the additional counts of fraudulent misrepresentation and negligent misrepresentation. The plaintiff is procedurally barred from pursuing these latter counts since it failed to raise these issues in the original complaint. Furthermore, even it were procedurally permissible to raise the latter issues here, the Court would find that the reasons for dismissing the seven counts would apply to these latter issues as well.

27